UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HSN NORDBANK AG, HSH NORDBANK
AG, LUXEMBOURG BRANCH and HSH
NORDBANK SECURITIES S.A.,

Plaintiffs,

- against -

RBS HOLDINGS USA INC., RBS
SECURITIES INC. (F/K/A GREENWICH
CAPITAL MARKETS, INC.) and
FINANCIAL ASSET SECURITIES CORP.,

Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  3|23|15
```

**MEMORANDUM
OPINION & ORDER**

13 Civ. 3303 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from Plaintiffs' investment in residential mortgage-backed

securities that were issued or underwritten by RBS Holdings USA Inc., RBS Securities Inc., and

Financial Asset Securities Corp. (collectively, the "Defendants" or "RBS"). Defendants have

moved (1) to strike certain paragraphs of the Complaint pursuant to Fed. R. Civ. P. 12(f); and (2)

to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Def. Mot. (Dkt. No. 17)) For the

reasons stated below, the motion to strike will be denied, and the motion to dismiss will be

granted in part and denied in part.

## BACKGROUND[1]

### I.     MORTGAGE SECURITIZATION

Residential mortgage-backed securities (RMBS) are financial instruments

---

[1] This Court's factual statement is drawn from the Complaint. "In considering a motion to
dismiss . . . the court is to accept as true all facts alleged in the complaint." Kassner v. 2nd Ave.
Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead
Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)).

collateralized by residential mortgages.  Securitization is a process that pools together thousands of individual mortgages into trusts that issue securities to investors in the form of certificates. (Cmplt. (Dkt. No. 11) ¶ 40)  A trustee manages each trust, overseeing, inter alia, the distribution of the trust's revenue to certificate holders.  (Id.)  This revenue is derived from the monthly payments of the borrowers whose mortgages are held by the trust.  (Id.)

The RMBS process begins when lending institutions, or "originators," make home loans to consumers that are secured by mortgages.  (Id. ¶ 41)  An RMBS "sponsor" or "seller" – usually an investment bank affiliate – purchases these mortgages in bulk from one or more originators.  (Id.)  To facilitate lending, sponsors regularly provide "warehouse" lines of credit to originators.  (Id. ¶ 42)  Sponsors ultimately sell the loans to a "depositor" – often another affiliate of that same bank.  (Id. ¶ 41)  The depositor is also considered the securities' "issuer."  (Id.)

An issuer typically re-underwrites the loans made by the originators, independently assessing the borrowers' ability to meet mortgage obligations.  This assessment involves reviewing the loan files provided by the originators, which contain the information the originators gathered in the lending process.  (Id. ¶¶ 43-44)  An issuer usually delegates this work to third-party due diligence vendors, such as Clayton Holdings, LLC ("Clayton").  (Id. ¶ 44)  The vendor verifies key information contained in the loan files, including the borrower's debt-to-income ratio, the reported appraisal value of the home, and whether the property is owner-occupied.  (Id.)  The vendor then gives the issuer a report that includes the vendors' findings, describes the originators' stated underwriting guidelines, and identifies which loans comply with the guidelines.  (Id. ¶ 45)  The issuer uses this report to determine which loans to securitize.  (Id. ¶ 46)

Following this review, the depositor "deposits" all of the loans into the trust. (Id. ¶ 47) The trust then issues certificates of varying seniority called "tranches," which entitle certificate holders to a portion of the payments the borrowers make. (Id. ¶ 48) The depositor next passes the certificates to underwriters, who offer them for sale to investors. (Id. ¶ 49)

Investors interested in purchasing certificates receive "Offering Materials" that characterize the securitized loans. (Id. ¶ 46) Prepared by the issuer, the Offering Materials make representations as to the mortgages' loan-to-value (LTV) and combined loan-to-value (CLTV) ratios, the originators' adherence to underwriting standards, and the mortgaged properties' owner-occupancy status. (Id.) The Offering Materials also certify that the mortgages and all necessary underlying documentation will be transferred to the trust on or before the closing date. (Id.)

## II.    THE PARTIES

Plaintiff HSH Nordbank AG ("Nordbank AG") is a commercial bank incorporated in Germany. (Id. ¶ 29) Plaintiff HSH Nordbank AG, Luxembourg Branch ("Nordbank Luxembourg") is a division of HSH Nordbank AG, with its main office in Luxembourg. (Id. ¶ 30) Plainitff HSH Nordbank Securities S.A. ("Nordbank Securities") is a wholly owned subsidiary of HSH Nordbank AG, with its principal place of business in Luxembourg. (Id. ¶ 31)

Defendants RBS Holdings USA Inc. ("RBS Holdings"), RBS Securities Inc. ("RBS Securities"), and Financial Asset Securities Corp. ("FASC") are Delaware corporations headquartered in Stamford, Connecticut. (Id. ¶ 32-34) RBS Holdings was known as Greenwich Capital Holdings, Inc. until April 2009. (Id. ¶ 32) RBS Holdings is the parent company of both RBS Securities and FASC. (Id.)

RBS Securities is a registered broker-dealer. (Id. ¶ 33) It was the lead or co-lead underwriter for each of the securitizations at issue and sold each of the certificates to Plaintiffs. (Id.) Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc. (Id.) FASC was the depositor for each of the securitizations. (Id. ¶ 34)

## III.   THE COMPLAINT

Plaintiffs allege various improprieties by Defendants in connection with the creation, offering, and sale of certain RMBS. Plaintiffs assert against all Defendants claims for common law fraud, fraudulent concealment, and, in the alternative, negligent misrepresentation. (Id. ¶¶ 258-284)

As to Defendants RBS Holdings and RBS Securities, Plaintiffs assert claims of aiding and abetting fraud. (Id. ¶¶ 285-291) In the alternative, against RBS Securities only, Plaintiffs assert a claim of rescission based on mutual mistake. (Id. ¶¶ 292-298)

In 2006, Plaintiffs purchased approximately $54,351,000 worth of RMBS certificates from the Defendants (the "Certificates"). (Id. ¶¶ 1, 10) Defendants sold, marketed, and issued these Certificates in three separate RMBS securitizations: SVHE 2006-OPT2, AMIT 2006-1, and FHLT 2006-A (collectively, the "Securitizations"). (Id. at 14, Table ("tbl.") 1) Defendants acquired the loans underlying these Certificates from third-party mortgage originators (and non-parties to this action) Fremont Investment & Loan ("Fremont"), Option One Mortgage Corporation ("Option One"), and Aames Investment Corporation ("Aames"). (Id. ¶¶ 142, 152, 157) Plaintiffs allege numerous knowing misrepresentations of material fact made by Defendants in the Securitizations' respective Offering Materials, which included registration statements, prospectuses, preliminary offering circulars, and other filings. (Id. ¶ 2)

4

Defendants' alleged misrepresentations relate to different stages of the securitization process. At the origination stage, Defendants allegedly failed to reveal in the Offering Materials that originators systematically abandoned their underwriting standards, thereby reducing the quality of loans in the securitization pool. (Id. ¶¶ 121-128) After origination, Defendants allegedly securitized and sold loans that their due diligence vendor had reported as defective. (Id. ¶ 10)

Plaintiffs further claim that Defendants understated the LTV and CLTV ratios of the Securitizations' loan pools by overstating the appraised values of the underlying properties. (Id. ¶¶ 65-82) These metrics materially affect investors' assessments of loan pools, for they reflect the amount of equity borrowers have in their homes, which, in turn, affects the likelihood of repayment. (Id. ¶ 66) The ratios also inform investors of the likelihood that the holder of the note will suffer a loss in the event of default. (Id. ¶ 68) Finally, the Complaint alleges misrepresentations about the owner-occupancy status of mortgaged properties included in the Securitizations, as well as failures to transfer mortgages and notes to the trusts. (Id. ¶¶ 83-92, 162-198)

## DISCUSSION[2]

### I.    DEFENDANTS' MOTION TO STRIKE

Defendants have moved to strike Paragraphs 118-19, 122, 131-36, and 139-59 of the Complaint because they rely on complaints and citations to news articles from other actions. See Def. Mot. (Dkt. No. 17) at 2; Def. Br. (Dkt. No. 18) at 12-13 (citing RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), aff'd, 387 F. App'x 72 (2d Cir. 2010)

---

[2]  This Court addressed very similar issues and arguments in Landesbank Baden-Württemberg v. RBS Holdings USA Inc., 14 F. Supp.3d 488 (S.D.N.Y. 2014). In that case, investors alleged similar improprieties in connection with the creation, offering, and sale of RMBS by, among others, two of the defendants in the instant case.

("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f).") (citing Lipsky v. Commonwealth United Corp., 551 F.2d 887, 892-94 (2d Cir. 1976))).

"To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) aff'd, 525 F. App'x 16 (2d Cir. 2013) (internal quotation marks and citations omitted). Defendants have not met this standard.

Defendants rely on RSM Prod. Corp., 643 F. Supp. 2d 382, which in turn relies on Lipsky, 551 F.2d 887. Although "some courts in this district have stretched the holding in Lipsky to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f)[,] [n]either Circuit precedent nor logic supports such an absolute rule." In re Bear Stearns Mortgage Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (internal citation omitted).

Here, the news reports and complaints cited in the disputed paragraphs are neither extraneous nor immaterial to the Complaint's allegations. For example, Plaintiffs allege that "Defendants' systematic misrepresentation of the quality of the Certificates they created and sold to investors is [] evidenced by a forensic review of loans conducted by Assured Guaranty Municipal Corp." (Cmplt. (Dkt. No. 11) ¶ 118) In referring to this study, Plaintiffs cite to the complaint filed in Assured Guaranty Municipal Corp. v. RBS Securities, Inc., No. 13 Civ. 2019 (S.D.N.Y.) (ECF No. 1, Mar. 26, 2013). "It makes little sense to say," as Defendants urge, "that

information from such a study – which [Plaintiffs' Complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint." Bear Stearns, 851 F. Supp. 2d at 768 n.24. Accordingly, Defendants' motion to strike will be denied.

## II.   LEGAL STANDARD GOVERNING MOTION TO DISMISS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and the court must also "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 557) (alteration in original), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

Fraud claims are subject to Fed. R. Civ. P. 9(b), which states that "a party must state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006)

7

(citation and quotation marks omitted).  The complaint must also plead facts that give rise to a strong inference of fraudulent intent.  S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir. 1996).

## III.   STATUTE OF LIMITATIONS

### A.   New York's Borrowing Statute

A federal court sitting in diversity applies the law of the forum in which it sits. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Under New York's "borrowing statute," non-resident plaintiffs' claims must comply with the statute of limitations of either (1) New York or (2) the jurisdiction in which the claim accrued, whichever is shorter.  N.Y. C.P.L.R. § 202. Accordingly, this Court must determine where Plaintiffs' claims accrued.

New York law dictates that "a cause of action accrues at the time and in the place of the injury."  Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999).  "When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."  Id.; see also Appel v. Kidder, Peabody & Co., 628 F. Supp. 153, 156 (S.D.N.Y. 1986) ("Where . . . the harm claimed is economic, the loss is sustained where the economic impact of the defendant's conduct is felt, usually but not invariably at the plaintiff's place of residence.").  "If the injured party is a corporation, then the place of residence for the purposes of [the borrowing statute] is traditionally the state of incorporation or the corporation's principal place of business."  Baena v. Woori Bank, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006).  Ultimately, "'the thrust of the inquiry' is 'who became poorer, and where did they become poorer' as a result of the conduct complained of."  Appel, 628 F. Supp. at 156 (quoting Maiden v. Biehl, 582 F. Supp. 1209, 1218 (S.D.N.Y. 1984)).

8

Plaintiff Nordbank AG is a "commercial bank incorporated in Germany" (Cmplt. (Dkt. No. 11) ¶ 29), and it is undisputed that the bank is a resident of Germany. (Def. Br. (Dkt. No. 18) at 29)  Nordbank Luxembourg is a "division" of Nordbank AG (Cmplt. (Dkt. No. 11) ¶ 30), and it is well established that a "branch or agency of a bank is not a separate entity." In re Liquidation of N.Y. Agency & Other Assets of Bank of Credit & Commerce Int'l, S.A., 90 N.Y.2d 410, 422 (1997).  Its claims, therefore, also accrued in Germany.  Finally, Nordbank Securities is a wholly owned subsidiary of Nordbank AG (Cmplt. (Dkt. No. 11) ¶ 31), so its losses would likewise be felt by Nordbank AG in Germany. See, e.g., Baena, 2006 WL 2935752, at *7 (applying limitation period of state in which parent company resides, because "economic impact of the injury was ultimately felt by" parent).  Accordingly, this Court finds that the German statute of limitations applies to all of Plaintiffs' claims.[3]

## B.     The German Statute of Limitations

The parties disagree as to the proper application of the German statute of limitations, and they have submitted competing expert opinions concerning this issue. Defendants argue that the statute of limitations begins to run on December 31 of the year in which a plaintiff learns of, or was grossly negligent in failing to discover, its fraud claim.  (Def Br. (Dkt. No. 18) at 30 (citing Janke Decl. (Dkt. No. 19) ¶¶ 7-8))  According to Defendants, "Plaintiffs were or should have been on notice of their claims" at some point in 2007, so the statute of limitations began to run on December 31, 2007.  (Def. Br. (Dkt. No. 18) at 30) Defendants cite various news reports and lawsuits, as well as monthly performance reports sent

---

[3]  This Court does not address Defendants' argument that Plaintiffs' negligent misrepresentation claim is time-barred under New York law, because that claim will be dismissed on other grounds. See Part VII, infra.

to Plaintiffs, in support of their argument that Plaintiffs had notice of their claims in 2007. (Id. at 31-34)

Plaintiffs contend that their claims are not time-barred under German law, because "the three-year period does not begin to run until the end of the year in which a plaintiff actually obtains knowledge, or would be grossly negligent not to have obtained knowledge, of facts sufficient to disclose (1) the identity of potential defendants, (2) the nature and existence of the fraud, and (3) the defendants' intent." (Pltf. Br. (Dkt. No. 24) at 27 (citing Mansel Decl. (Dkt. No. 27) ¶¶ 4-6) (emphasis omitted)) Plaintiffs argue that Defendants have not demonstrated that Plaintiffs knew (or were grossly negligent in not knowing) of their claims in 2007. (Pltf. Br. (Dkt. No. 24) at 29)

The parties also disagree about the German law standard for gross negligence, particularly as applied to a corporation. While Plaintiffs contend that "German law sets a high bar to start the three-year clock" (Pltf. Br. (Dkt. No. 24) at 28), Defendants claim that Plaintiffs' German law expert – Professor Dr. Mansel – has overstated the gross negligence standard, particularly as it applies to corporations. (Def. Reply Br. (Dkt. No. 22) at 14)

"Limitations-based arguments in RMBS fraud actions have not generally been accepted at the motion to dismiss phase." HSH Nordbank AG v. Goldman Sachs Grp., Inc., 992 N.Y.S.2d 158, 2013 WL 8476977 at *2 (Sup. Ct. N.Y. Cty. 2013) (citing Capital Ventures Int'l. v. J.P. Morgan Mortgage Acquisition Corp., 2013 WL 535320, at *7 (D. Mass. Feb. 13, 2013); In re Countrywide Fin. Corp. Mortgage-Backed Sec., 2012 WL 1322884, at *4 (C.D. Cal. Apr. 16, 2012); Allstate Ins. Co. v. Morgan Stanley, No. 651840/2011, 2013 WL 2369953, at *9 (N.Y. Sup. Ct. N.Y. Cty. 2013)). Prospective plaintiffs in such actions often "have a difficult

task in obtaining sufficient notice of the facts underlying their claims." Id. at 3 (citing In re Countrywide, 2012 WL 1322884, at *4).

Based on the present record, this Court cannot conclude as a matter of law that Plaintiffs were put on notice of their claims in 2007. In support of their argument that Plaintiffs knew or should have known of their claims at that time, Defendants point to statements in the media, monthly reports showing spikes in delinquencies in the underlying mortgages of the securitizations at issue, RMBS lawsuits, and known economic losses on the Certificates. (Def. Br. (Dkt. No. 18) at 31-34; Reply Br. (Dkt. 22) at 14-15) Even assuming, arguendo, that German law requires a prospective plaintiff to monitor foreign news accounts and litigation, it does not follow that Plaintiffs were or should have been on notice of their fraud claims in 2007. See Allstate, 2013 WL 2369953, at *9 ("The collapse of the various loan originators . . . would not necessarily apprise plaintiffs that Morgan Stanley was complicit in their wrongdoing."). The information cited by Defendants is not necessarily indicative of misrepresentation or scienter, two key elements of Plaintiffs' fraud claim. See, e.g., Capital Ventures Int'l, 2013 WL 535320, at *7 (poor performance would not necessarily alert plaintiff to the alleged abandonment of underwriting standards).

A determination as to when Plaintiffs knew or were grossly negligent in not knowing about their fraud claims must await the development of a more complete factual record.

## IV.   **FRAUDULENT INTENT**

As to Plaintiffs' common law fraud claims, Fed. R. Civ. P. 9(b) requires Plaintiffs to "(1) specify the statements that [they] contend[] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner, 459 F.3d at 290. Plaintiffs' allegations must give rise to a strong inference

11

of fraudulent intent, see S.Q.K.F.C., Inc., 84 F.3d at 634, which "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Lerner, 459 F.3d at 290-91 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

The Complaint alleges that Defendants made fraudulent representations in connection with (1) underwriting guidelines; (2) LTV and CLTV ratios; (3) owner-occupancy rates; (4) credit ratings; and (5) proper assignment of mortgages. (Cmplt. (Dkt. No. 11) ¶¶ 4-16) Plaintiffs do not argue that Defendants had a motive to make fraudulent misrepresentations "beyond a general profit motive common to all corporations, which does not suffice." Deutsche Zentral-Genossenchaftsbank AG v. HSBC North Am. Holdings, Inc., 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013) (citing Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)). They do argue, however, that sufficient circumstantial evidence exists to give rise to a strong inference of "conscious misbehavior or recklessness." (Pltf. Br. (Dkt. No.24) at 15-19)

### A.      Abandonment of Underwriting Guidelines

In their Offering Materials, Defendants represent that the loans underlying their mortgage securitizations will either adhere to the originators' underwriting guidelines or have "sufficient compensating factors." (Cmplt. (Dkt. No. 11) ¶ 120) Defendants also represent that they will perform their own due diligence on loans made by the originators. (Id. ¶¶ 126-27) Plaintiffs contend that these statements were misrepresentations, because Defendants "knew they were false from their own actions and due diligence [], which demonstrated that originators systematically disregarded their underwriting guidelines." (Id. ¶ 128)

12

The Complaint alleges that Defendants and their third-party due diligence vendor, Clayton, had access to and performed due diligence on the underlying loan files, and that Defendants either "knew or were reckless in not knowing that the loans did not conform to the [originators'] specified underwriting guidelines." (Id. ¶¶ 97, 100-01, 107-08, 112)  In support of this claim, Plaintiffs point to a Federal Housing Finance Agency ("FHFA") forensic review of loans from SVHE 2007-OPTI, a securitization not at issue here, but one which apparently was assembled by the Defendants.  According to Plaintiffs, 80% of the loan files FHFA reviewed "had not been written within the stated guidelines, or otherwise breached Defendants' representations."  (Id. ¶ 131)

Plaintiffs also rely on a report prepared by Clayton (the "Clayton Report"), summarizing the results of its due diligence reviews of more than 67,000 loans securitized by RBS "from the first quarter of 2006 through the second quarter of 2007."  (Id. ¶ 10, 97) According to the Clayton Report, FASC "waived in" – i.e., decided to purchase and securitize – "over 53% of the loans that Clayton had reviewed and rejected as non-conforming with the underwriting guidelines and without compensating factors."  (Id. ¶ 104)  All of the Securitizations at issue were assembled during the time period covered by this report.  (Id. ¶ 10)

Plaintiffs also rely on the deposition of an unnamed Clayton employee – testifying in an unrelated action – in which the witness states that "Clayton supervisors would often inform the due diligence underwriters that the purchasers wanted the underwriters to approve loans that often did not satisfy the underwriting guidelines."  (Id. ¶ 107)  This desire allegedly extended "[a]cross all clients," including Defendants.  (Id.)

With respect to the loans securitized in the trusts, Plaintiffs further argue that – by virtue of Defendants' warehouse lending arrangements with Fremont and Option One –

13

Defendants were uniquely positioned to become aware that the originators had abandoned their underwriting guidelines. (Id. ¶ 113-117) The Complaint alleges that RBS had "direct access to the underlying loan files and detailed information for [the] loans," giving it an "inside look into the true quality of the loans it securitized." (Id. ¶ 115)

This Court concludes that Plaintiffs have sufficiently alleged that Defendants "'knew facts or had access to information suggesting that their public statements were not accurate.'" F. Hous. Fin. Agency v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 491 (S.D.N.Y. 2012) (quoting ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009)). Plaintiffs' allegations also raise a strong inference that Defendants either knew, or were reckless in not knowing, that their Offering Materials falsely stated that the loans comprising the Securitizations met originators' underwriting guidelines.[4]

---

[4] In a December 18, 2014 letter, Defendants cite to IKB Int'l S.A. v. Bank of Am. Corp., 584 F. App'x 26, 27 (2d Cir. 2014) – a non-precedential summary order – to suggest that Plaintiffs' allegations in this action are insufficient to plead a strong inference of fraudulent intent. (Dec. 18, 2014 Ltr. (Dkt. No. 30) at 2) In that case, the court noted that the complaint alleged that defendants had access to information inconsistent with their alleged misstatements, but did not "'specifically identify the reports or statements containing this information.'" IKB Int'l S.A., 584 F. App'x at 28 (citing Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)). Moreover, the complaint cited a third-party due diligence report that was published "well after the issuance of the securities at issue," but did not indicate that the "report represent[ed] a retrospective summary of information previously provided by [the due diligence vendor] to the defendants on a 'securitization by securitization' basis." Id. Here, Defendants argue that because Plaintiffs do not allege that the Clayton Report and the FHFA study were made available to the Defendants before the securitizations at issue were created, these documents cannot support an inference of fraudulent intent.

Plaintiffs' fraudulent intent claim turns not on the Clayton Report and the FHFA study, however, but instead on the allegations that Clayton provided reports "on a daily basis" to RBS setting forth (1) the number of loans RBS was purchasing that failed to meet underwriting guidelines and lacked "compensating factors," and (2) Clayton's justification for giving these loans a failing grade. (Cmplt. (Dkt. No. 11) ¶ 10) The Clayton Report is offered not because it was made available to Defendants, but instead because it is representative of the type of information Defendants received from Clayton on a daily basis, and of the type of due diligence that was

**B.     CLTV Ratios and Owner-Occupancy Rates**

Plaintiffs claim that "originators deliberately inflated their appraisals" of mortgaged properties, and that Defendants became aware of this conduct as a result of their own due diligence. (Cmplt. (Dkt. No. 11) ¶ 73) According to the Complaint, these inflated appraisals led to a substantial "understatement of the CLTV ratios, and a corresponding understatement of the investment risk" associated with the Certificates purchased by Plaintiffs. (Id. ¶ 81) Plaintiffs' statistical study indicates that Defendants understated the weighted average CLTV ratios for the loans underlying the SVHE 2006-OPT2 by 14 percent, while CLTV rations for the AMIT 2006-1 trust were understated by 10.3 percent. (Id. at 25, tbl. 3) For the FHLT 2006-A trust, Plaintiffs found a 4.7 percent understatement of the weighted averaged CLTV ratio. (Id.) Plaintiffs' loan-level investigation also revealed that owner-occupancy rates in the SVHE 2006-OPT2, AMIT 2006-1, and FHLT 2006-A trusts were overstated by 29.9, 25.4, and 29.9 percent, respectively. (Id. at 30, tbl. 4)

The Complaint does not, however, allege facts sufficient to raise a strong inference of scienter with respect to misrepresentations about CLTV ratios and owner-occupancy rates. While Plaintiffs' loan-level investigations support an inference that originators systematically overstated appraisal values, they do not raise a strong inference that Defendants knew about this activity. "It is true . . . that the magnitude of inaccuracy can sometimes provide circumstantial evidence that a fraud defendant made her false statements knowingly or recklessly." JPMorgan Chase, 902 F. Supp. 2d at 493 (citing In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 73 (2d Cir. 2001); Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000)). "Generally, however, such evidence must be supported by additional circumstantial evidence in order for the

performed on loan pools. Accordingly, IKB Int'l provides no support for Defendants' arguments concerning fraudulent intent.

15

plaintiff to carry her pleading burden, particularly where the originator of the false information is a third-party." Id. (citing In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003)).

Here, as in JPMorgan Chase, Plaintiffs have not pled sufficient facts to demonstrate that Defendants knew at the relevant time that (1) originators were systematically overstating appraisal values, or (2) owner-occupancy rates were significantly overstated. See also Fed. Hous. Fin. Agency v. Goldman, Sachs & Co., 2012 WL 5494923, at *2 (S.D.N.Y. Nov. 12, 2012); Fed. Hous. Fin. Agency v. Ally Fin. Inc., 2012 WL 6616061, at *2-3 (S.D.N.Y. Dec. 19, 2012). Plaintiffs imply that Defendants' due diligence process was designed to determine not only whether a loan's characteristics complied with its originator's guidelines, but also to test the veracity of the originators' information. (Cmplt. (Dkt. No. 11) ¶ 221-222) The Complaint does not allege, however, that the Defendants' due diligence disclosed the appraisal inaccuracies. Similarly, although Plaintiffs claim that the Defendants represented that "mortgaged properties would be appraised (or otherwise valued) using a particular standard" (Id. ¶ 5), Plaintiffs have not pled facts showing that Defendants either (1) checked the CLTV and owner-occupancy information provided by the originators to determine whether this information was accurate, or (2) represented that they would so. Accordingly, Plaintiffs have not pled facts sufficient to raise a strong inference of scienter with respect to allegedly misrepresented CLTV ratios or owner-occupancy rates.

## C.    Credit Ratings

Plaintiffs allege that Defendants falsely represented that the investment ratings provided by credit rating agencies would take "into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (Id.

16

¶ 232)  Defendants allegedly knew that these representations were false, because "Defendants misled the rating agencies concerning, among other things, the CLTV ratios, owner-occupancy rates and adherence to underwriting guidelines."  (Id. ¶ 235)  The Complaint adds that "[t]hese misrepresentations caused dramatic understatements by the rating agencies of both the likely rates of default and the resultant loss severity of defaulted loans."  (Id.)

To the extent that the alleged misrepresentations about credit ratings are based on Plaintiffs' claims that Defendants knew that originators had abandoned underwriting guidelines, those claims adequately plead scienter.  See Fed. Hous. Fin. Agency v. Merrill Lynch & Co., 903 F. Supp. 2d 274, 282 n.4 (S.D.N.Y. 2012) ("[G]iven the allegation that defendants provided the same false information to the ratings agencies that they included in the Offering Materials, allegations tending to show recklessness with respect to the one support a similar inference with respect to the other.  Thus, plaintiff's allegations of credit-rating fraud survive insofar as they rely on the defendants' provision of false information regarding underwriting standards to the ratings agencies.")  Insofar as the alleged misrepresentations involve CLTV ratios and owner-occupancy rates, the Complaint does not adequately plead scienter, for the reasons discussed above.

### D.    Mortgages and Note Transfers

Plaintiffs also allege that the mortgage-backed securities they purchased from Defendants were not, in fact, backed by mortgages.  (Cmplt. (Dkt. No. 11) ¶¶ 162-166)  Two investigations conducted by Plaintiffs concluded that Defendants frequently did not assign the underlying mortgages and notes to the issuing trusts, contrary to their representations.  (Id. ¶ 163)  The Complaint asserts that, "as it was [FASC's] responsibility to effectuate the transfers, Defendants knew that the statements were false, and that the mortgages would not be properly

17

and timely assigned, at the time the representations were made." (Id. ¶ 180) Plaintiffs also point to a "preliminary investigation" they performed – conducted at a time that is not disclosed – that allegedly reveals that the "pattern by Defendants of not transferring notes and mortgages to trusts pre-dated the issuance of the Certificates." (Id. ¶ 217)

These allegations are not sufficient to raise a strong inference of fraudulent intent. S.Q.K.F.C., 84 F.3d at 634. Plaintiffs do not identify the source of the "preliminary investigation," when it was conducted, whether Defendants were made aware of the results of the investigation, and, if so, when. While Plaintiffs' investigations suggest that Defendants may not have satisfied their obligations concerning the assignment of mortgages and notes, there is little pled to show that Defendants never intended – at the time they made their representations about assignment – not to assign the underlying mortgages and notes. Cf. Goldman Sachs Grp., Inc., 2013 WL 8476977 at *6 (breach of contract is proper remedy absent factual allegations that failure to assign and transfer notes and mortgages was a deliberate, premeditated practice); see also Dowlings, Inc. v. Homestead Dairies, Inc., 88 A.D. 1226, 1229 (3d Dept. 2011) ("Promises of future performance, alone, are insufficient to sustain a claim of fraud."). Accordingly, Plaintiffs' fraud claims regarding faulty transfer of mortgages and notes are insufficient.

## V.   MATERIAL MISSTATEMENTS AND OMISSIONS

Defendants argue that Plaintiffs have not adequately alleged the materiality of (1) Defendants' failure to disclose that originators had abandoned their underwriting standards, and (2) Defendants' misrepresentations regarding credit ratings, to the extent that those alleged misrepresentations involve a failure to disclose to the credit rating agencies that originators had abandoned their underwriting standards. (See Def. Br. (Dkt. No. 18) at 13-14, 18)

## A.     Underwriting Guidelines

The Complaint alleges that Defendants falsely represented that all loans included in the Securitizations either conformed with the originators' underwriting guidelines or had sufficient "compensating factors" to justify their securitization. (Id. ¶ 120-128)  Plaintiffs further allege that Defendants knew that these statements "were false from their own actions and due diligence [], which demonstrated that originators had systematically disregarded their underwriting guidelines." (Id. ¶ 128)  According to Plaintiffs, "Defendants nevertheless represented to investors, such as Plaintiffs, that the underwriting guidelines were being followed." (Id.)

Defendants offer two arguments as to why these statements were not materially misleading. (Def Br. (Dkt. No. 18) at 13-15)  First, Defendants argue that they "disclose[d] the very risks Plaintiffs contend were concealed," because the Offering Materials disclosed that originators might make exceptions to their underwriting guidelines. (Id. at 13)  Next, they argue that Plaintiffs' allegations regarding underwriting guidelines are not sufficiently particularized, because these allegations do not necessarily relate to the loans backing the Certificates at issue here. (Id. at 13-15)

As to Defendants' first argument, "[c]ourts considering RMBS claims have overwhelmingly held that such disclosures or warnings do not give notice to investors of the defendant's 'wholesale abandonment of underwriting standards.'"  Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC, 2014 WL 432458, at *8 (Sup. Ct. N.Y. Cty. Jan. 24, 2014) (listing cases) (quoting Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011)); see also Public Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 483 (S.D.N.Y. 2010) ("[T]he alleged repeated deviation from

19

established underwriting standards is enough to render misleading the assertion in the registration statements that underwriting guidelines were generally followed."); N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 122-23 (2d Cir. 2013) (reversing dismissal of fraud claims where plaintiff had provided "fairly specific" account of how originators had abandoned underwriting standards).

Likewise meritless is Defendants' argument that there is no nexus between the originators' abandonment of sound underwriting practices and the loans in the securitized pools at issue. "A plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges 'widespread abandonment of underwriting guidelines.'" Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (quoting Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010)). As discussed above, the Complaint alleges, inter alia, that (1) the Clayton Report concluded that RBS allowed a substantial percentage of "waive-ins" during the relevant time period; and (2) FHFA's report found substantial deviation from underwriting guidelines in another RBS securitization created at about the same time as the securitizations at issue here. (Cmplt. (Dkt. No. 11 ¶¶ 104, 131) These allegations are sufficient to raise an inference that the originators systematically abandoned their underwriting guidelines with respect to the loans underlying the Certificates. In not disclosing this alleged practice, the Offering Materials contained material misstatements or omissions.

## B.    Credit Ratings

The Complaint alleges that the Offering Materials represented that the credit ratings were based on an assessment of the likelihood of delinquencies and defaults in the

20

underlying mortgage pools.  (Cmplt. (Dkt. No. 11) ¶ 232)  Plaintiffs contend that these

representations were false and misleading because FASC "obtained and marketed inflated ratings

for the Certificates by misrepresenting the risk profile of the underlying loans to the rating

agencies."  (Id. ¶ 233)  Defendants argue that they are not responsible for credit ratings, which

"are statements only of the rating agencies that assigned them."  (Def. Br. (Dkt. No. 18) at 18)

Defendants add that "Plaintiffs do not allege that Defendants inaccurately conveyed the ratings

assigned by the rating agencies and, as such, the Offering Materials contain no misstatement."

(Id.)

   Defendants' arguments are not persuasive.  "'The truth of a statement made in the

prospectus is adjudged by the facts as they existed when the registration statement became

effective.'"  In re Agria Corp. Sec. Litig., 672 F. Supp. 2d 520, 526 (S.D.N.Y. 2009) (quoting In

re Flag Telecom Holdings Ltd. Sec. Litig., 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004)).  Here,

Defendants stated in their Offering Materials that the securities "rating takes into consideration

the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with

the certificates."  (Cmplt. (Dkt. No. 11) ¶ 232)  Plaintiffs claim that this statement was

knowingly false and misleading, at the time it was made, because Defendants knew, inter alia,

that originators were not adhering to their stated guidelines, rendering the information made

available to rating agencies unreliable.  If Defendants knew, as Plaintiffs allege, that the rating

agencies could not properly assess the risk presented by the underlying loans, the Offering

Materials' representation that the credit ratings reflected the characteristics of the underlying

mortgage loans was false and misleading.  Accordingly, Plaintiffs have sufficiently pled

misstatements regarding credit ratings.  Accord Stichting Pensioenfonds ABP v. Credit Suisse

Grp. AG, 2012 WL 6929336, at *10 (Sup. Ct. N.Y. Cty. Nov. 30, 2012) (statements regarding

agencies' rating method actionable where plaintiff alleged that Credit Suisse knew that the data given to the rating agencies was false).[5]

## VI.   RELIANCE

### A.   Justifiable Reliance

"A misrepresentation is only actionable if it (1) induces a party to act, and (2) the party was justified . . . in being so induced." Landesbank Baden-Württemberg v. RBS Holdings USA Inc., 14 F. Supp.3d 488, 510 (S.D.N.Y. 2014). "New York law imposes an affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by investigating the details of the transaction." Global Minerals & Metals Corp. v. Holme, 35 A.D.3d 93, 100 (1st Dept. 2006). However, where the misrepresented facts are "peculiarly within the misrepresenting party's knowledge," reliance is justifiable. Dall. Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 785 (2d Cir. 2003). "[B]ecause justifiable reliance 'involve[s] many factors to consider and balance, no single one of which is dispositive,' it is 'often a question of fact for the jury rather than a question of law for the court.'" JPMorgan Chase, 902 F. Supp. 2d at 496 (quoting STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011)).

---

[5] Defendants also argue that Plaintiffs' fraud claims should be dismissed because the Complaint's use of group pleading violates Fed. R. Civ. P. 9(b)'s particularity requirement. (Def. Br. (Dkt. No. 18) at 5-6) Defendants' argument is misplaced, because the Complaint alleges common law fraud, rather than a federal securities law violation. See In re Optimal U.S. Litig., 837 F. Supp. 2d 244, 264 (S.D.N.Y. 2011) (group pleading is permitted where plaintiffs state a common law fraud claim, as opposed to a federal securities law claim, and "allege interaction between the corporate entities relating to the subject matter of the alleged fraudulent misstatement or omission that is more than conclusory"). Here, the Complaint explains – at length – the role that each Defendant played in each Securitization, and how each Defendant is responsible for the alleged misrepresentations. (Cmplt. (Dkt. No. 11) ¶¶ 50-64) These allegations are sufficient to make out a common law fraud claim, and do not violate Rule 9(b).

Plaintiffs contend that they reasonably relied on the Defendants' Offering Materials in deciding to purchase the Certificates, and that their "review and analysis could not uncover the fact that the representations of material fact were false." ((Cmplt. (Dkt. No. 11) ¶¶ 250, 265)

Defendants argue that the Complaint does not plead facts showing justifiable reliance. (Def. Br. (Dkt. No. 18) at 10) First, Defendants claim that Plaintiff's failure to specify the persons who read and relied on their misrepresentations is fatal to their claim. The case law Defendants rely on for this argument is not on point, however. In Devaney v. Chester, 709 F. Supp. 1255 (S.D.N.Y. 1989) – after four amended complaints and extensive discovery – the court dismissed plaintiff's action because of his inability to specify who had read and relied on a written statement allegedly made by the defendant. Devaney, 709 F.Supp. at 1264. Here, there has been no discovery, and Plaintiffs have identified the entities involved in making investment decisions regarding the Certificates.

Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett, No. 05 Civ. 8988 (GEL), 2007 WL 1732427 (S.D.N.Y. June 14, 2007), also does not support Defendants' argument. In Bennett, the complaint did not "allege that plaintiffs read the allegedly misleading registration statements, or even that they knew of their existence." Bennett, 2007 WL 1732427, at *9. Here, Plaintiffs have alleged that they would not have purchased the Certificates had it not been for the Defendants' representations in the Offering Materials. (See, e.g., Cmplt (Dkt. No. 11) ¶¶ 237, 241, 246)

Relying on HSH Nordbank v. UBS AG, 95 A.D.3d 185 (1st Dept. 2012), Defendants next argue that – given Plaintiffs' financial sophistication – their failure to inquire into information allegedly in Defendants' sole possession is incompatible with a finding of justifiable reliance. (Def. Br. (Dkt. No. 18) at 11-12) Defendants further contend that their

23

"extensive and detailed risk disclosures" should preclude a finding of justifiable reliance. (Id. at 11) Neither argument is persuasive. First, the alleged misrepresentation in Nordbank did not relate to facts peculiarly within the seller's knowledge. "'[T]he core subject of the complained-of representations [in that case] was the reliability of the credit ratings used to define the permissible composition of the reference pool,'" and the defendant there established that "the reliability of the credit ratings could have been ascertained from reviewing market data or other publicly available information." Lorelely Fin. (Jersey) No. 3 Ltd. V. Citigroup Global Mkts. Inc., 119 A.D.3d 136, 147-48 (1st Dept. 2014) (quoting and citing Nordbank, 96 A.D.3d at 196, 199).

      Here, Defendants have not undermined Plaintiffs' claim that "review and analysis could not uncover the fact that the representations of material fact were false." (Cmplt (Dkt. No. 11) ¶ 250) Moreover, the disclaimers in Nordbank "relate[d] directly or indirectly to the reliability of credit ratings in the relevant market." Nordbank, 96 A.D.3d at 199. Defendants' disclaimers and disclosures, by contrast, do not "relate directly or indirectly" to the specific particular type of information allegedly misrepresented – namely, the originators' abandonment of underwriting guidelines. See Loreley, 119 A.D.3d at 147.

      This Court concludes that Plaintiffs have adequately pled justifiable reliance.

## B.    Loss Causation

      Defendants also contend that Plaintiffs have not pled loss causation, because they have not alleged "facts 'which, if proven, would show that [their losses were] caused by the alleged misstatements as opposed to intervening events.'" (Def. Br. (Dkt. No. 18) at 23) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005)). Courts have repeatedly rejected this argument in other RMBS cases. See, e.g., MBIA Insurance Co. v.

24

Countrywide Home Loans, Inc., 87 A.D.3d 287, 296 (1st Dept. 2011) ("It cannot be said, on this

pre-answer motion to dismiss, that MBIA's losses were caused, as a matter of law, by the 2007

housing and credit crisis."); Dexia Holdings, Inc. v. Countrywide Fin. Corp., No. 2:11 Civ.

7165(MRP), 2012 WL 1798997, at *6 (C.D. Cal. Feb. 17, 2012) ("The link between a risk of

default and a Certificate's value is indisputable and provides sufficient causal nexus to survive a

motion to dismiss. . . . Untangling the effect of the alleged misrepresentations from the effects of

the broader financial crisis will present a complicated issue of fact. It is therefore better saved

for a more complete factual record.")

          Here, Plaintiffs have adequately alleged that Defendants' alleged

misrepresentations in the Offering Materials caused the drop in the Certificates' value, and that

the Certificates' value would have been much higher – notwithstanding the collapse in the

housing market – had Defendants not committed fraud. (Cmplt. (Dkt. No. 11) ¶ 27, 257) These

allegations satisfy Plaintiffs' burden at this stage.

##     C.    **Cognizable Damages**

          Finally, Defendants contend that Plaintiffs have not – and cannot – plead any

cognizable damages, for they have neither sold the Certificates nor suffered any missed

payments of principal or interest. (Def. Br. (Dkt. No. 18) at 24) Defendants' argument

misapprehends New York law, however, under which fraud damages are calculated based on the

difference between the price paid for an asset and its true value on the sale date. Merrill Lynch

& Co. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007); see also NECA-IBEW

Health & Welfare Fund v. Goldman Sachs Co., 693 F.3d 145, 166 (2d Cir. 2012) ("[B]asic

securities valuation principles . . . belie the proposition that a fixed income investor must miss an

interest payment before his securities can be said to have declined in 'value.' The reasonable

inference from [plaintiff's] allegations is that, because the loans backing the Certificates were riskier than defendants represented, the future cash flows to which [plaintiff] was entitled . . . required a higher discount rate once the Offering Documents' falsity was revealed, resulting in a lower present value."). Plaintiffs have adequately alleged that the Certificates are worth far less than what they paid for them, and that their true value would have been much lower at the time of sale, had RBS disclosed, inter alia, that originators had systematically abandoned their underwriting standards. See Cmplt. (Dkt. No. 11) ¶¶120-128, 255-257; see also Allstate Ins. Co. v. Ace Securities Corp., No. 650431/2011, 2013 WL 1103159 at *28 (Sup. Ct. N.Y. Cty. Mar. 14, 2013) ("While defendants assert that the proper measure of damages is the difference between the price paid for a security and its true worth at the time of purchase, it is easily inferable from the pleadings that plaintiffs paid an inflated price for the RMBS and are thus [] entitled to recover for the impermissible premium they paid.") Accordingly, Defendants' motion to dismiss for failure to plead cognizable damages will be denied.

## VII.    NEGLIGENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT

"A claim for negligent misrepresentation requires the plaintiff to allege: '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" HSH Nordbank AG v. Barclays Bank PLC, 42 Misc.3d 1231(A), 2014 WL 841289, at *22 (Sup. Ct., N.Y. Cty. Mar. 3, 2014) (quoting Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 180 (2011)). "A cause of action for fraudulent concealment requires proof of the elements of fraud based on a misrepresentation . . . as well as 'an allegation that the defendant had a duty to disclose material information and that it failed to do so.'" Id. (quoting P.T. Bank Cent. Asia v. ABN AMRO Bank N.V., 301 A.D.2d 373, 376 (1st Dept.

26

2003)). "A fraudulent concealment claim must be based on a 'special relationship or fiduciary obligation.'" Id. (quoting Gomez-Jiminez v. New York Law Sch., 103 A.D.3d 13, 18 (1st Dept. 2012), leave to appeal denied, 20 N.Y.3d 1093 (2013)).

Plaintiffs have not alleged facts demonstrating the special relationship necessary to sustain actions for negligent misrepresentation and fraudulent concealment. The parties here are "sophisticated entities [who were] engaged in an arm's length transaction." Id. Based on the allegations in the Complaint, no special relationship – fiduciary or otherwise – existed between them. Plaintiffs argue that the "special facts doctrine" applies and imposed a duty on Defendants to disclose because of their "superior knowledge of essential facts." (Pltf. Br. (Dkt. No. 24) at 23) However, they have not cited any case involving RMBS in which a negligent misrepresentation or fraudulent concealment claim has been permitted to proceed on this theory, and New York courts routinely dismiss such claims. See HSH Nordbank AG v. Barclays Bank PLC, 2014 WL 841289, at *22 ("Plaintiffs do not allege the special or fiduciary relationship necessary to support either a negligent misrepresentation or fraudulent concealment claim."); MBIA Ins. Corp., 87 A.D.3d at 297 ("Because MBIA has failed to allege facts showing that these sophisticated commercial entities engaged in anything more than an arm's length business transaction, the negligent misrepresentation claim was properly dismissed."); Goldman Sachs Grp., Inc., 2013 WL 8476977 at *12 ("Goldman Sachs's exclusive access to the underlying loan files does not constitute the type of unique or specialized knowledge necessary to state such a claim."). Accordingly, Plaintiffs' negligent misrepresentation and fraudulent concealment claims will be dismissed.

27

## VIII.  AIDING AND ABETTING FRAUD

Plaintiffs assert a cause of action against Defendants RBS Holdings and RBS Securities for aiding and abetting the alleged fraud committed by FASC. (Cmplt. (Dkt. No. 11) ¶¶ 285-291) To state a claim for aiding and abetting fraud, Plaintiffs must allege "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co., 64 A.D.3d 472, 476 (1st Dept. 2009).

Defendants argue that this claim should be dismissed because (1) RBS Holdings and RBS Securities are each named as principals in the fraud count and "obviously cannot aid and abet [themselves]"; (2) Plaintiffs have not pled with the requisite particularity actual knowledge of the fraud; and (3) the Complaint does not "separately identity those acts which constituted substantial assistance and those which constituted the primary violation." (Def. Br. (Dkt. No. 18) at 24-25)

Defendants' arguments are not persuasive. First, the Complaint does not claim that RBS Securities aided and abetted its own fraud. Instead, it alleges that "RBS Securities delivered the Offering Materials prepared by [FASC] that contained the false statements." (Cmplt. (Dkt. No. 11) ¶ 287) Such an act would be sufficient to show "substantial assistance." Second, "a plaintiff alleging an aiding-and-abetting fraud claim may plead actual knowledge generally, particularly at the prediscovery stage, so long as [fraudulent] intent may be inferred from the surrounding circumstances." DDJ Mgmt., LLC v. Rhone Grp., LLC, 78 A.D.3d 442, 443 (1st Dept. 2010).

Here, the Complaint sets forth allegations as to each Defendant's role in the securitization process and the preparation of the Offering Materials. (Cmplt. (Dkt. No. 11)

28

¶¶ 50-64) It also alleges that "[RBS Holdings] and RBS Securities had actual knowledge that the statements in the Offering Materials concerning the credit quality of the underlying loans for all Trusts were false. . . . [Such knowledge] is directly inferable from their substantial involvement in the securitization process, and the fact that several officers and/or directors of [FASC] were also officers and directors of RBS Securities and/or the parent of RBS [Holdings]." (Id. ¶ 288) Plaintiffs' allegations are sufficient at this stage.[6]  Accordingly, Defendants' motion to dismiss the aiding-and-abetting fraud claim will be denied.

## IX.  RESCISSION BASED ON MUTUAL MISTAKE

Plaintiffs allege a cause of action for rescission based on mutual mistake. They argue that if RBS Securities was unaware of the alleged failures to transfer title to the trusts, "then a mutual mistake of a material fact existed at the time of [] contract, and the transactions are void." (Cmplt. (Dkt. No. 11) ¶ 298)  The mutual mistake alleged by Plaintiffs would be that the Offering Materials provided for "an investment in trusts that actually owned residential mortgages and underlying promissory notes at the time of investment," when, in reality, they would not.  (Id. ¶ 296)

Plaintiffs' rescission claim fails, because the Offering Materials' statements regarding title transfer are forward-looking, in that they contemplate Defendants' future obligations under the parties' agreements. "The doctrine of mutual mistake affords equitable relief only where the parties were mistaken as to facts existing at the time the contract was entered into." Raphel v. Booth Mem'l Hosp., 67 A.D.2d 702, 703 (2d Dept. 1979) (emphasis in original).  Plaintiffs argue that "[t]he mortgage loans were to be transferred to the Trusts at the

---

[6]  Defendants also argue that the aiding and abetting claim must be dismissed because Plaintiffs have not delineated what acts constitute substantial assistance and what acts are primary violations. (Def. Br. (Dkt. No. 18) at 25)  Defendants have not cited law demonstrating that such a delineation is required at this stage of the proceedings, however.

closing of the Securitizations – at the same time the Certificates were issued. Thus, the loan transfers were not 'future' events but contemporaneous ones." (Pltf. Br. (Dkt. No. 24) at 26). However, all of the Complaint's allegations about title transfer contemplate future performance, not existing facts. (See, e.g., Cmplt. (Dkt. No. 11) ¶ 175 ("On the Closing Date, the Depositor will transfer to the Trust. . . ."); id. ¶ 176 ("Defendants also promised to deliver the promissory notes to the Trustees for the Trust.") (emphasis added)) Given that Plaintiffs have not pled mutual mistake as to a then-existing fact, this Court will dismiss Plaintiffs' cause of action for rescission based on mutual mistake.

## CONCLUSION

For the reasons stated above, Defendants' motion to strike under Fed. R. Civ. P. 12(f) is denied. Defendants' motion to dismiss is granted in part and denied in part, as set forth above. The Clerk of Court will terminate the motions (Dkt. No. 17).

The Court will conduct a Rule 16 conference in this matter on April 30, 2015 at 11:00 a.m. in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York, 10007. Pursuant to this Court's Individual Rules of Practice in Civil Cases, the parties are directed to submit a joint letter and proposed Case Management Plan by April 23, 2015.

Dated: New York, New York
March 20, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

30